UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-30130
Summary Calendar
_____


UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

                    versus

JEFFREY B. CARR,

                              Defendant-Appellant.

_____

Appeal from the United States District Court for the
Eastern District of Louisiana
(94-CR-191-ALL)
_____
(October 10, 1995)


Before KING, SMITH, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

     Jeffrey B. Carr was convicted of conspiracy to manufacture, sell, and distribute prohibited electronic communication intercepting devices.  47 U.S.C. § 605(e)(4); 18 U.S.C. § 2.  He also was convicted of substantive violations of § 605(e)(4).  He appeals, arguing that there was a fatal variance between the

_____

[*]     Local Rule 47.5 provides:  "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession."  Pursuant to that Rule, the Court has determined that this opinion should not be published.

indictment and the proof, that § 605(e)(4) is unconstitutionally vague, and that the district court erred in calculating his offense level. Finding no error, we affirm.

## I. PROCEDURAL HISTORY

Carr and two other individuals, Jerry McCarter and Jeff Mayes, were the principal officers of Video Marketing Services, Inc. (VMS), each holding one-third of the issued stock in that company. The company manufactured devices that could be used for lawful text delivery or, with some modification, for the unlawful purpose of decryption of satellite cable programming. On July 1, 1994, Carr and three codefendants (Ronald MacDonald, William Hunter, and Mike Hunter) were charged in a seven-count indictment with conspiracy and distribution of prohibited electronic communication intercepting devices. After a jury trial, Carr was convicted of all five of the counts in which he was charged. The district court sentenced Carr to 40 months imprisonment and three years supervised release on each of the five counts, the sentences to run concurrently. Carr appeals.

## II. FATAL VARIANCE

Carr contends that there was a fatal variance between the allegations in the indictment and the evidence presented at trial. In reviewing a claim of fatal variance, this Court reverses only if the evidence at trial varied from the allegations of the indictment and the variance prejudiced the defendant's substantial rights. United States v. Faulkner, 17 F.3d 745, 760 (5th Cir.), cert. denied, __ U.S. __, 115 S.Ct. 193 (1994). Substantial rights are affected if the defendant is surprised at trial or placed in risk

2

of double jeopardy.  United States v. Robinson, 974 F.2d 575, 578 (5th Cir. 1992).  Even assuming that Carr shows a variance between the indictment and the proof at trial, he has failed to establish that his substantial rights were violated.

Count 1 of the indictment alleged that, beginning at a time unknown but prior to 1993, and continuing through September 1993 Carr and other conspirators, named and unnamed, conspired to manufacture, sell, and distribute electronic devices (hereinafter referred to as VMS devices), knowing that the devices were primarily used in the unauthorized decryption of satellite cable programming.  The indictment charged that the conspirators carried out the conspiracy by marketing the devices through a sham "Sales and Network Agreement" wherein distributors for VMS warranted that the devices would be sold only as a lawful text-delivery system.  The indictment charged that by means of this sham agreement, VMS had a fraudulent protective shield with which to disclaim knowledge of and liability for the use of its devices in the unlawful decryption of satellite cable programming.  Counts 4 through 7, the substantive counts, charged that on six occasions Carr sold and distributed the VMS devices, knowing that the devices were primarily of assistance in the unauthorized decryption of satellite cable programming.[1]

Carr asserts that the evidence at trial shows that there was a legitimate use for the VMS device -- text delivery.  He contends that the evidence showed that he was aware of the potential for

---

[1]  Counts 2 and 3 charged Carr's three coconspirators, but not Carr, with similar substantive acts.

3

consumers to use the device for illegally descrambling satellite television signals and that, because of this, VMS placed warning seals on all of its devices cautioning the users that the device was intended for text delivery only, that any other use would be illegal, and that the breaking of the seal would invalidate the warranty on the device.

Carr argues that although the Government offered some evidence that he had violated the antidecryption statute, there remains a fatal variance because he did not commit the violations in the manner alleged in the indictment. Carr argues that the Government asserted in the indictment that he and his coconspirators had accomplished their sales of the VMS device through "a sham `Sales and Network Agreement' wherein VMS distributors apparently warranted that the VMS devices would be sold only as a lawful text delivery system."[2]  He argues that the evidence at trial, however, showed that the "Sales and Network Agreements" were not shams but were in fact created at the suggestion of VMS's Jerry McCarter after he contacted an attorney about how to market the devices. Carr contends that if the sales agreements were not the ways and

---

[2]  The entire "ways and means" section of the indictment provides as follows:

> Among the ways and means by which the defendants and their coconspirators carried out the conspiracy was to market the VMS devices through a sham "Sales and Network Agreement" wherein VMS distributors apparently warranted that the VMS devices would be sold only as a lawful text delivery system.  By means of this Agreement, VMS had a fraudulent protective shield with which to disclaim knowledge of and liability for the use of its devices in the unlawful decryption of satellite cable programming.

means of carrying out the illegal distribution of the VMS devices, as the indictment alleged, then Carr was not guilty of the charges in the indictment.

The evidence showed that at least one of the three founders of VMS, Jerry McCarter, believed that VMS was in fact established to manufacture and sell the VMS devices solely for the legal purpose of "delivering text" onto a television screen.[3] McCarter testified that he was aware that the VMS device could be used to pirate satellite programming and that that was why the company placed the warnings on the devices stating that they were to be used for text delivery only. There was also testimony, however, that, whatever McCarter's intentions were, Carr intended that the text delivery application of the VMS device be used only as a cover for the more marketable use of the device -- decryption of satellite cable transmissions.

Peter Hoban testified that, before purchasing the VMS system from one of VMS's distributors, he talked to Carr over the phone about how the VMS device was capable of unscrambling the "wizard codes" that protected satellite programming from being pirated. Another witness testified that Carr told him that he had travelled to Canada to obtain the wizard codes from the data stream that came off of a certain satellite. Hoban testified about a meeting at his fishing camp attended by Carr and one of his coconspirators, Bill

---

[3] McCarter believed that the VMS device could be used somehow in combination with outdated satellite dishes and modems to allow a person to receive text on their television screen using only his remote control. The viewer could then switch back and forth between normal television and text delivery simply by pressing a button on the remote control.

5

Hunter, at which the three discussed satellite piracy while Carr installed the VMS device into the Hoban's computer. Hoban testified that, while at the camp, Carr explained to him how the descrambling technology worked. Subsequent to Carr's installing the wizard codes into the host computer at Hoban's camp, Hoban testified that he purchased approximately 1000 VMS devices from VMS and sold them to consumers for the purpose of unscrambling satellite programming signals. Without the wizard codes installed by Carr into Hoban's host computer, the VMS devices purchased by Hoban and sold to home consumers could not have been used to unscramble the programming signals.

Based on the evidence presented, the Government proved the elements of the crimes alleged in the indictment. It established that Carr conspired with at least Bill Hunter, Dana Lefever, and Peter Hoban to distribute VMS devices for the purpose of illegally descrambling satellite programming signals. Although the indictment alleged that Carr conspired with three other individuals (Ron MacDonald, William Hunter, and Mike Hunter) to commit the aforementioned acts, the indictment also states that Carr conspired with others, "named and unnamed." This Court has "held on numerous occasions that a defendant's conspiracy conviction can be upheld even if all other alleged coconspirators tried with him are acquitted, so long as the indictment alleges other named or unnamed coconspirators and there is sufficient evidence of a conspiracy involving these other individuals who were not tried with the defendant." Faulkner, 17 F.3d at 768 n. 35. Additionally, although Jerry McCarter may not have viewed the "Sales and Network

6

Agreements" as a sham, the evidence indicated that Carr viewed them as a convenient cover for the illegal business. The indictment alleged as much. Accordingly, Carr has not show that the indictment failed to inform him adequately of the charges against him to such an extent that he could not prepare his defense. See United States v. Thomas, 12 F.3d 1350, 1357 (5th Cir.), cert. denied, __ U.S. __, 114 S.Ct. 1861 (1994). Nor has Carr shown that he faces a risk of a second prosecution for the same offenses. See id. Because Carr's substantial rights were not affected, his claim of variance cannot be fatal. Carr is not entitled to relief on this claim.

### III. UNCONSTITUTIONALLY VAGUE

Carr next contends that the anti-decryption statute under which he was charged and convicted is unconstitutionally vague and overly broad. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness so that an ordinary person may understand what conduct is actually prohibited." United States v. Tansley, 986 F.2d 880, 885 (5th Cir. 1993). A reasonable degree of certainty, however, is all that is required. Id. Further, one who is bent on wrongdoing may not use the fair notice requirement as a shield. Id.

In pertinent part, 47 U.S.C. § 605(e)(4) provides that "[a]ny person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming" shall be subject to fines and

7

imprisonment. This Court previously has addressed a constitutional challenge to 47 U.S.C. § 605(e)(4). In <u>United States v. Harrell</u>, 983 F.2d 36 (5th Cir. 1993), we held that § 605(e)(4) "specifically proscribes the surreptitious interception of satellite transmissions and it is not vague or ambiguous at all." <u>Id</u>. at 39. Although Carr acknowledges the holding in <u>Harrell</u>, he argues that it is not controlling because, in that case, the contention was that the statute did not make clear whether the prohibited conduct was intended to apply to individual users or only to commercial cable companies, rendering it void for vagueness. We agree that while <u>Harrell</u> precludes any facial challenge to the statute, it is not dispositive of Carr's claim that it is unconstitutional as applied to him.

Carr argues that whether the equipment was "primarily of assistance" in the unauthorized decryption of satellite programming is unconstitutionally vague and overly broad. It is undisputed that the devices were designed[4] to have text legally delivered through telephone lines and had to be modified before they could be used to illegally descramble the satellite signals. He further asserts that although the government's expert testified that the

---

[4] Carr's remaining arguments center on the fact that the device had to be modified before it could be used to illegally intercept the signals. Those arguments convince us that 18 U.S.C. § 2512(1)(b) was not applicable to his conduct. Section 2512(1)(b) makes it a crime to possess an electronic device knowing "that the <u>design</u> of such device renders it primarily useful for the purpose of surreptitious interception of wire or oral communications. . . ." However, he was not convicted of violating § 2512(1)(b); instead, he was convicted of violating 47 U.S.C. § 605(e)(4). Accordingly, we find the arguments afford him no relief.

8

primary use of the device was to illegally descramble satellite signals after modification, the expert admitted that the devices had a legitimate function. He therefore argues that the application of the statute requires a citizen to guess at his peril how a legitimate piece of equipment might be misused by a buyer. Here, however, the evidence overwhelmingly showed that Carr knew that the devices would be modified so that they could be used to illegally intercept signals. Indeed, Carr admitted his knowledge of the intended illegal activity during his testimony. It is Carr's criminal knowledge, not the criminal intent of the purchaser of the device, that violates § 605(e)(4). Cf. Tobacco Accessories, Etc. v. Treen, 681 F.2d 378, 385 (5th Cir. 1982) (intent requirement in drug paraphernalia statute includes seller, not just purchaser or manufacturer).

"[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand. . . . One to whose conduct a statute clearly applies may not successfully challenge it for vagueness. . . ." Tansley, 986 F.2d at 886 (brackets and ellipsis in opinion) (citation and internal quotation marks omitted). We find that § 605(e)(4) clearly applies to Carr's conduct, and, therefore, his challenge to the vagueness of the statute as applied to him must fail.

Carr also contends that the statute is overly broad. "A statute will survive an overbreadth challenge unless it reaches a substantial amount of constitutionally protected conduct." United States v. Wicker, 933 F.2d 284, 287 (5th Cir. 1991) (citation and

9

internal quotation marks omitted), <u>cert. denied</u>, 502 U.S. 958, 112 S.Ct. 419 (1991). To the extent that an overbreadth problem might occur in a particular application of § 605(e)(4), such could "be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be implied." <u>Id</u>. at 288 (citation and internal quotation marks omitted). Carr has failed to show that § 605(e)(4) reaches the requisite constitutionally protected conduct. We find no merit in Carr's claim that 47 U.S.C. § 605(e)(4) punishes actions which are innocent or constitutionally protected.[5]

## IV. SENTENCING CALCULATION

Carr also contends that the district court erred by enhancing his offense level by 13 levels based on the total value of the devices sold. The presentence report (PSR) arrived at the increase by multiplying the number of VMS devices that VMS sold (39,000) by

---

[5] In the alternative, Carr argues that the district court erred in denying his request for the following jury instruction:

> The term "primarily of assistance" as used in the statute which I read to you means that the device "as designed" must render it primarily of assistance for the illegal intercept of encrypted satellite signals. A person who designs and distributes a device that is not primarily of assistance in illegal satellite interceptions does not violate the statute simply because he can reasonably anticipate that others might change the device so as to make it primarily of assistance in illegal interception.

The requested instruction adds an element (the "as designed" element) to the statute that does not exist. The district court therefore did not abuse its discretion in denying the requested instruction. <u>United States v. Pennington</u>, 20 F.3d 593, 600 (5th Cir. 1994).

the retail values of the devices (ranging from $99 to $225). The PSR therefore estimated the total value to be between $2.5 million and $5 million. Based on that figure, pursuant to § 2F1.1 of the guidelines, the PSR recommended increasing Carr's offense level by 13. See § 2F1.1(b)(1)(N). Carr objected to the PSR's recommendation, asserting that "while there was evidence that VMS sold approximately 39,000 devices through various distributors there was no evidence presented that all of the devices were sold for illegal purposes, much less that all of the unnamed distributors purchased the devices for illegal use." At the sentencing hearing, the district court overruled Carr's objection, finding that "[t]he evidence at trial indicated that the defendant intended that each of the 39,000 be used for illicit purposes. The fact that the ultimate end user did or did not use the device in conformity with the law is not relevant."

On appeal, Carr contends that some of the 39,000 devices sold by VMS were used for legitimate purposes, presumably text delivery. He also argues that the number of VMS devices alleged in the indictment numbered only 77. He argues that the total loss would thus amount to only between $10,000 and $20,000 and that, under § 2F1.1, his offense level only would have been increased by three levels instead of 13. Of course, under the relevant conduct guideline, U.S.S.G. § 1B1.3, the conduct for which the defendant is sentenced is not limited to the conduct alleged in the indictment.

Moreover, "[a] district court's findings of fact for purposes of applying the Sentencing Guidelines are reviewed under the clearly erroneous standard of review." United States v. Hooker,

11

997 F.2d 67, 75 (5th Cir. 1993). A factual finding is clearly erroneous if it is not plausible in light of the record taken as a whole. Anderson v. City of Bessemer City, 470 U.S. 564, 573-76, 105 S.Ct. 1504, 1511-12 (1985).

In sentencing, the district court may consider any evidence that has "sufficient indicia of reliability to support its probable accuracy," including evidence not admissible at trial. § 6A1.3, comment.; accord United States v. Manthei, 913 F.2d 1130, 1138 (5th Cir. 1990). The PSR itself bears such indicia. United States v. Alfaro, 919 F.2d 962, 966 (5th Cir. 1990). At trial, there was testimony that Carr "knew what the part was being sold for." The court also heard a tape recording of a conversation between an undercover agent and Carr related to illegal descrambling devices in which Carr indicated his willingness to sell the device, and he also asserted that they had "70,000 boards being updated through [their] system." The undercover agent explained that he understood "updating" to mean that they were transmitting wizard codes.

Carr has not met his burden of proving that the information relied upon by the district court is "materially untrue, inaccurate or unreliable," and, thus, the district court's determination is not clearly erroneous. See United States v. Angulo, 927 F.2d 202, 205 (5th Cir. 1991).

Accordingly, the district court's judgment is AFFIRMED.